```
           IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

| | | |
|---|---|---|
| JOHN EMMI, | : | CIVIL ACTION |
| | : | NO. 16-3774 |
|     Plaintiff, | : | |
| | : | |
|  v. | : | |
| | : | |
| MICHAEL DEANGELO, et al., | : | |
| | : | |
|     Defendants. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                          August 21, 2017

      Plaintiff John Emmi ("Plaintiff") brings this action under 42 U.S.C. § 1983 for excessive force and bystander liability against Defendants Michael DeAngelo and Benjamin King, both of whom are Pennsylvania State Police Troopers. During trial, Defendants sought to introduce testimony from Plaintiff's wife, Marianne Emmi ("Mrs. Emmi"). Mrs. Emmi, though present in court, invoked her spousal privilege and refused to testify. For the reasons that follow, the Court upholds Mrs. Emmi's claim to spousal privilege but rules admissible certain portions of the deposition Mrs. Emmi previously provided in this case.

**I.     BACKGROUND**

      Plaintiff alleges in his complaint that, on July 21, 2014, he was pulling out of the driveway of his residence at 365C S. Old Middletown Road in Media, Pennsylvania, when he

noticed Defendants DeAngelo and King approaching his vehicle. See Compl. ¶¶ 9-10, ECF No. 1. Upon seeing Defendants DeAngelo and King, he turned off the engine of his vehicle, stepped out of the vehicle, and placed his hands in the air. Id. ¶ 10. Defendant DeAngelo then "suddenly and without any reasonable justification" grabbed Plaintiff's arm and "swung him around, forcefully pushed his body up against the rear of his vehicle, then proceeded to pull the Plaintiff's arms around his back and placed him in handcuffs." Id. ¶ 11. While Plaintiff was being handcuffed, Defendant King "without any reasonable justification, repeatedly kneed Plaintiff in his right leg." Id. ¶ 12. Plaintiff claims that "he was not resisting arrest and [this] use of force was unreasonable under the circumstances in violation of . . . the Fourth Amendment." Id. ¶ 14.

Defendants' version of the story includes the following preamble, the truth of which Plaintiff has not disputed:

> On July 21, 2014 at approximately 6pm, Plaintiff and his wife, Marianne Emmi, got into an argument at their home in Middletown Township, Delaware County. Mrs. Emmi eventually called 911. Plaintiff ripped the phone off the wall during the call. Plaintiff also at some point climbed in a window and broke a vase. [Defendants DeAngelo and King] were dispatched to the location. They were informed by dispatch that it was an active domestic dispute, the call had been cutoff and the husband drove a pickup truck.

Defs.' Final Pretrial Mem. at 1, ECF No. 22.

2

At trial, Defendants moved to compel Mrs. Emmi's testimony as a witness against Plaintiff. Alternatively, Defendants sought to read into the record the deposition that Mrs. Emmi had previously provided in this case. Plaintiff opposed both requests. For the reasons that follow, the Court finds that Mrs. Emmi has properly invoked her spousal privilege and therefore may not be compelled to testify against Plaintiff, her husband. Relevant portions of her deposition testimony, however, may be read into the record pursuant to Federal Rule of Civil Procedure 32 and Federal Rule of Evidence 804.

**II. PRIVILEGE**

Federal Rule of Evidence 501 governs the applicability of federal privileges and also delineates when state law privileges apply to federal litigation. This rule provides in full as follows:

> The common law--as interpreted by United States courts in the light of reason and experience--governs a claim of privilege unless any of the following provides otherwise:
>
> - the United States Constitution;
> - a federal statute; or
> - rules prescribed by the Supreme Court.
>
> But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.

Fed. R. Evid. 501.

Although the Supreme Court has considered federal common law privileges for spouses in the context of criminal proceedings,[1] the law is less clear regarding application of these privileges in civil proceedings. The Commonwealth of Pennsylvania, however, has recognized two spousal privileges that may apply in a civil action. The first of these is a privilege not to testify against one's spouse. See 42 Pa. Cons. Stat. § 5924 ("In a civil matter neither husband nor wife shall be competent or permitted to testify against each other."). The second is a privilege not to testify regarding confidential communications between spouses. See 42 Pa. Cons. Stat. § 5923 ("[I]n a civil matter neither husband nor wife shall be competent or permitted to testify to confidential communications made by one to the other.").

"Rule 501 requires a district court exercising diversity jurisdiction to apply the law of privilege which would be applied by the courts of the state in which it sits." Samuelson v. Susen, 576 F.2d 546, 549 (3d Cir. 1978). In contrast, a federal question case usually calls for the application of federal privileges. See Wm. T. Thompson Co. v. Gen. Nutrition Corp., 671 F.2d 100, 103 (3d Cir. 1982) ("[I]n

---

[1] See generally Trammel v. United States, 445 U.S. 40 (1980) (privilege against adverse spousal testimony); Blau v. United States, 340 U.S. 332 (1951) (privilege for confidential marital communications).

4

federal question cases the federal common law of privileges applies."). However, when there is no compelling federal interest, and the subject matter is one which traditionally has been assigned to the states and for which state jurisprudence is well developed, federal courts may "resort to state law analogies for the development of a federal common law of privileges." Id. at 104; Reo v. U.S. Postal Serv., 98 F.3d 73, 77 (3d Cir. 1996) ("Rather than developing a federal common law . . . we can instead rely on the well-established rules of the various States."); see also Nice v. Centennial Area Sch. Dist., 98 F. Supp. 2d 665, 668 (E.D. Pa. 2000) (Robreno, J.) (citing Erwin Chemerinsky, Federal Jurisdiction, § 6.2.1 at 339 (2d ed. 1994)).

The purpose of the spousal privileges "is generally said to be 'the preservation of marital harmony and the resultant benefits to society from that harmony.'" Ebner v. Ewiak, 484 A.2d 180, 183 (Pa. Super. Ct. 1984) (quoting Commonwealth ex rel. Platt v. Platt, 404 A.2d 410, 413 (Pa. Super. Ct. 1979)); see also CAP Glass, Inc. v. Coffman, 130 A.3d 783, 788 (Pa. Super. Ct. 2016) ("Like § 5924, [§ 5923] serves to protect and promote marital harmony."). Despite serving a similar purpose, however, the "testimonial" and "communications" privileges remain distinct:

> [T]he spousal incompetence provision of section 5924 and the spousal confidential communication privilege of section 5923 are quite separate and distinct. The former provision disqualifies a husband or wife to give any testimony adverse to the spouse subject to the exceptions in 5924(b); the latter is much more limited and relates to the competence of a spouse to testify regarding confidential communications.

CAP Glass, Inc., 130 A.3d at 788 (quoting B.K. v. Dep't of Pub. Welfare, 36 A.3d 649, 656 (Pa. Commw. Ct. 2012)).

In this case, Mrs. Emmi has invoked her absolute privilege under § 5924 to not testify as a witness for Defendants against Plaintiff, her husband.[2] The Court upholds this privilege on the basis that (1) as a matter of undisputed fact, Mrs. Emmi is currently married to Plaintiff; and (2) as a matter of law, Mrs. Emmi's testimony would be "against" Plaintiff. See 42 Pa. Cons. Stat. § 5924.

At least one other court within this judicial district has held that testimony regarding "interactions with a third party" is "not testimony 'against' [the other spouse] and does not violate Section 5924." Carroll v. Student Transp., Inc., No. 10-1439, 2011 WL 382563, at *2 (E.D. Pa. Feb. 7, 2011). Nevertheless, this Court holds that Mrs. Emmi's testimony would

---

[2] Mrs. Emmi was represented during her brief appearance in court by Dana Ingham, Esquire, an attorney retained by Mrs. Emmi in connection with her marital issues after her deposition but prior to the start of trial in this case. Mrs. Emmi testified on the record at trial that she wished to invoke her spousal privilege to not testify against Plaintiff.

6

be "against" Plaintiff within the meaning of § 5924 because she was called to testify by the adverse party, i.e., Defendants in this case.[3] This interpretation of "against" accords with the purpose of the marital privileges; the very act of testifying as a witness on behalf of an adverse party, regardless of the subject matter of the testimony, cannot fairly be said to preserve and promote "marital harmony." Ebner, 484 A.2d at 183.

**III. ADMISSIBILITY**

Given Mrs. Emmi's proper invocation of the privilege and refusal to testify, the Court finds that she is "unavailable" for purposes of Federal Rule of Civil Procedure 32, which provides in part that a "[a] party may use for any purpose the deposition of a witness, whether or not a party, if the court finds . . . on motion and notice, that exceptional circumstances make it desirable--in the interest of justice and with due regard to the importance of live testimony in open court--to permit the deposition to be used." Fed. R. Civ. P. 32(a)(4)(E). The relevant portion of Mrs. Emmi's testimony pertains to the 911 call she made immediately prior to the incident at issue in this case, and it is undisputed that the

---

[3] Mrs. Emmi did not contend, and the Court does not find, that the § 5923 privilege for confidential marital communications is applicable in this case.

recording of this 911 call is no longer available.[4] This testimony includes the information Mrs. Emmi provided to 911 authorities, which bears relevance to Defendants' assertions that they were responding to "an active domestic dispute" and that "the [911] call had been cutoff." Defs.' Final Pretrial Mem. at 1. The jury appropriately may make critical inferences, based at least in part on this testimony, as to what knowledge and state of mind Defendants might have had as they approached Plaintiff in his driveway on the evening in question.

This testimony shall not be considered hearsay because Mrs. Emmi is also "unavailable" as a witness under the Federal Rules of Evidence. See Fed. R. Evid. 804(a)(2) ("A declarant is considered to be unavailable [to testify] as a witness if the declarant . . . refuses to testify about the subject matter despite a court order to do so."). Mrs. Emmi's unavailability triggers the exception providing that any "testimony that was given as a witness" at a "lawful deposition" during the "current proceeding" is "not excluded by the rule against hearsay if the declarant is unavailable as a witness." Fed. R. Evid. 804(b)(1)(A).

---

[4] Counsel for Defendants explained on the record at trial that, due to very high call volume, recordings of 911 calls are typically maintained for no longer than a few months. This lawsuit was not filed until nearly two full years after the incident occurred.

8

**IV. CONCLUSION**

For the foregoing reasons, the Court concludes that Mrs. Emmi cannot be compelled to testify against her husband, Plaintiff John Emmi. However, insofar as certain portions of Mrs. Emmi's deposition testimony relate to the 911 call immediately preceding the incident underlying this litigation and sheds light on the complete set of circumstances surrounding that incident, these portions shall be admissible pursuant to Federal Rule of Evidence 804(b)(1)(A) and "in the interest of justice" under Federal Rule of Civil Procedure 32(a)(4)(E).[5]

---

[5] Specifically, all testimony from page 13, line 23 through page 17, line 11 of Mrs. Emmi's deposition in this case shall be admissible. <u>See</u> Appendix 1. All other portions of the testimony are deemed inadmissible on grounds that its prejudicial nature substantially outweighs its probative value. <u>See</u> Fed. R. Evid. 403.

# APPENDIX 1

1  MARIANNE EMMI
2  that had been occurring like weeks and days
3  prior to that. But John came home that
4  afternoon extremely intoxicated, and he started,
5  you know, getting loud with me.
6     And it's like it was so long ago, and
7  it all happened so quickly. I don't -- it's
8  very vague to me at this point.
9     Q.  Okay. And if you don't remember
10 specifics, that's fine.
11    A.  So I just want to be honest about
12 that.
13    Q.  Right, and I appreciate that.
14    A.  Yeah.
15    Q.  And if you don't remember specifics,
16 that's fine. Just tell me what you do remember.
17    A.  I do remember him taking my phone
18 outside and smashing it and breaking my phone,
19 so then I locked the latch because, you know, I
20 got scared, and he climbed in the window. There
21 was a big vase there. Not even a -- like a huge
22 vase. And he smashed it, and that's to the
23 point where I called the police.
24    Q.  So he came home. Do you know where he
25 had been?

1  MARIANNE EMMI
2     A.  He had been down to his cousin's
3  house, I'm pretty sure, and he picked up a pizza
4  on the way home and...
5     Q.  And he smashed the -- was it a cell
6  phone, or a cordless phone, or..?
7     A.  A cell phone.
8     Q.  A cell phone. Whose phone was it?
9     A.  Mine.
10    Q.  All right. And did he rip it from
11 you, or how did he get it?
12    A.  Yeah. I guess he took it out of my
13 hands. Like I said, it all happened very
14 quickly.
15    Q.  Were your sons around?
16    A.  Yeah. They there at the time.
17    Q.  So you closed the front door to
18 prevent him from coming back in?
19    A.  Yeah.
20    Q.  I think you said at that point he
21 climbed into --
22    A.  Well, there is a window in our house
23 that we can --
24    Q.  Climb into?
25    A.  Yeah.

1  MARIANNE EMMI
2     Q.  Okay. Is that the dining room window?
3     A.  Yeah.
4     Q.  Did he have difficulty getting in
5  through that window?
6     A.  Not that I can remember. No. I don't
7  think so.
8     Q.  The vase being smashed, was that in
9  the process of that, or did he --
10    A.  He came in like mad, and that was what
11 he first did.
12    Q.  So is that before he climbed in the
13 window?
14    A.  Well, the vase was right there.
15    Q.  Right.
16    A.  In like the corner of the dining room
17 where the window was. It had like pussy willows
18 in it, and stuff like that.
19    Q.  And he smashed it --
20    A.  Yeah.
21    Q.  -- to the ground?
22    A.  Yeah.
23    Q.  Were you scared?
24    A.  Yeah.
25    Q.  And that's why you called --

1  MARIANNE EMMI
2     A.  Yeah.
3     Q.  -- 911?
4     A.  But there had been things leading up
5  to that days prior, so it was -- I hate to say
6  it was like about to happen at some point, you
7  know. There were other things that happened
8  that scared me and stuff like that.
9     Q.  In the days prior, you did not call
10 the police?
11    A.  No.
12    Q.  State police patrols your area?
13    A.  Yeah.
14    Q.  You don't have a local police
15 department?
16    A.  No, we don't. Yeah, because I'm
17 outside the borough of Media.
18    Q.  So you have a Media address?
19    A.  Yeah.
20    Q.  But you're technically outside the
21 borough of Media?
22    A.  Yeah. We're in Middletown Township.
23    Q.  Explain to me what you said when you
24 called the police. I know this is tedious.
25    A.  Well, I think I called on the house

MARIANNE EMMI

1 line at that point. Yeah. Well, they asked me
2 a series of questions like was there a gun in
3 the house. You know, that kind of stuff, and
4 then they came to the house. I mean, once you
5 call, they're going to come no matter what.
6 Q. Right, right. But I do need to know
7 what you remember of those series of
8 questions --
9 A. They asked if there was alcohol
10 involved.
11 Q. -- when you were on the phone.
12 A. They asked if there was a firearm in
13 the house.
14 Q. Okay. And how did you answer those
15 questions?
16 A. Yes, yes. Well, I'm not sure if I
17 said about the firearm because I wasn't positive
18 it was in the house. That I can't be sure of.
19 Q. It wasn't out in the area?
20 A. No. I mean, I know that John has a
21 gun. Yeah.
22 Q. John has a gun. Okay.
23 A. And I didn't expect that he was going
24 to use it on me. Trust me.

MARIANNE EMMI

1 Q. Right.
2 A. I know that's probably what they have
3 to ask.
4 Q. Right, right. Sure. What did you say
5 about alcohol involved? You said, "Yes"?
6 A. Yeah. I was pretty sure that, you
7 know...
8 Q. Do you remember if they asked any
9 questions about what type of vehicle he had?
10 A. I think they did actually because then
11 he got in the car -- he got in his truck to
12 leave. At that point they were already coming
13 down our street. Not our street, our driveway.
14 Q. So he got in the truck to leave. Were
15 you still on the phone when he got in the truck
16 to leave?
17 A. I don't think so.
18 Q. But they may have asked about what
19 type of truck he has -- what type of vehicle he
20 has? I'm sorry.
21 A. I think that they did. Yeah. I don't
22 remember to be honestly. Yeah. But we live
23 back off the road, so we have a rather long
24 private driveway.

MARIANNE EMMI

1 Q. Right.
2 A. So he was backing out.
3 Q. I'm going to get to that.
4 A. Okay. Sorry.
5 Q. Because that's pretty much what this
6 whole lawsuit is about.
7   What type of vehicle does he have, or
8 did he have at that time?
9 A. Well, at the time he had a Frontier.
10 I think a pickup truck, a Frontier.
11 Q. What color was it?
12 A. Gray, like a grayish color. It was --
13 I mean, he has a new car since then, so I think
14 it's a Frontier. It's a pickup truck.
15 Q. Oh, that's fine. It's a pickup truck?
16 A. Yeah.
17 Q. That's totally fine. So how did the
18 911 call end? Did it end abruptly, or was it..?
19 A. Yeah, it was real quick. Yeah, yeah.
20 Q. Did he rip a phone off the wall?
21 A. I don't remember that. I don't think
22 so.
23 Q. Did Mr. Emmi interfere with that phone
24 call at all to your recollection?

MARIANNE EMMI

1 A. Well, I had said I was going to call
2 911. Yeah. That's when he grabbed my cell.
3 Like, that's --
4 Q. Okay, okay. So you had the cell
5 phone?
6 A. Yeah, at first.
7 Q. And you said you were going to call
8 the 911, and that's when he took it from you and
9 smashed it --
10 A. Yeah.
11 Q. -- because he didn't want you calling
12 911?
13 A. Yeah.
14 Q. And he did that out front?
15 A. Yeah. And then I locked the top
16 latch --
17 Q. And then he climbed in the window.
18 A. -- and that made him very mad
19 Q. When, in that sequence of events, did
20 you call 911 on I guess what would be the house
21 phone?
22 A. After he broke the vase. Like, after
23 that, yeah.
24 Q. While you were speaking to 911, the